**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **AMETEK, INC.,** | **CIVIL ACTION** |
| Plaintiff, | |
| *v.* | **NO. 20-3140-KSM** |
| **FEDEX TRADE NETWORKS TRANSPORT & BROKERAGE, INC.,** | |
| Defendant. | |

## MEMORANDUM

**Marston, J.**                                                                 **January 5, 2023**

Plaintiff Ametek, Inc. initiated this suit against Defendant FedEx Trade Networks Transport and Brokerage, Inc. ("FTN") for breach of contract and promissory estoppel after FTN allegedly failed to seek a refund on Ametek's behalf for tariffs the United States Customs and Border Protection ("Customs") imposed on items Ametek imported.  (*See* Doc. No. 1.)

Presently before the Court is FTN's motion for summary judgment.  (Doc. No. 56.) Ametek opposes the motion.  (Doc. No. 57.)  For the reasons that follow, the Court denies the motion.

## I.      Background

Viewing the evidence in the light most favorable to Ametek, the relevant facts are as follows.

### A.  *The Parties and a General Overview of their Relationship*

FTN is a provider of worldwide freight forwarding services, including customs brokerage, trade, and customs advisory services.  (Doc. No. 58-1 at ¶ 9; *see also* Doc. No. 57-3

at ¶ 4 (stating FTN assists customers like Ametek in obtaining customs clearance at the time of the arrival of goods into the United States); Doc. No. 57-11 at 21:8–22:2 (Ametek's international trade and customs sanctions counsel's testimony that Ametek used FedEx as a brokerage company).)

Ametek is a leading global manufacturer of electronic instruments and electromechanical devices and is a global provider of third-party maintenance, repair, and overhaul services for commercial, regional, general aviation, and rotor-wing aircraft.  (Doc. No. 58-1 at ¶ 1; Doc. No. 57-3 at ¶ 2.)  Ametek does business, trades as, and operates through its subsidiary, Ametek MRO Florida Inc. (the "MRO Division") and frequently imports customer-owned units for repair and then exports such items after repair.  (Doc. No. 58-1 at ¶ 2.)

Imported items must pass through Customs and are sometimes subject to certain duties. (*Id.* at ¶ 3.)  FTN pays the duties to Customs on behalf of Ametek and then invoices Ametek for the duties paid and service fees incurred.  (*Id.*)

Generally, an item that enters the United States for which tariffs are paid but which a tariff exception under the Harmonized Tariff Schedule[1] or some other statutory exception might be claimed, can be refunded by Customs upon timely filing of a claim with certain required documentation.  (*Id.* at ¶ 5.)  This process is known as Post Summary Correction ("PSC").  (*Id.*) For each item for which a refund is sought, a separate PSC has to be filed.  (Doc. No. 57-3 at ¶ 7.)  The deadlines for filing PSCs are imposed by Customs and are based on the date on which

---

[1] The Court takes judicial notice of the fact that the Harmonized Tariff Schedule "sets out the tariff rates and statistical categories for all merchandise imported into the United States."  *See* Harmonized Tariff Schedule of the United States, U.S. Int'l Trade Comm'n, https://www.usitc.gov/glossary/term/harmonized-tariff-schedule-united-states-hts.  "U.S. Customs and Border Control administers the [Harmonized Tariff Schedule] at U.S. ports of entry and also provides advice and rulings on matters relating to the classification of imports."  *Id.*

the item entered the United States.  (Doc. No. 58-1 at ¶ 6.)  Customs immediately rejects as untimely any PSCs filed beyond the applicable deadline.  (*See id.*)

FTN has assisted customers, including Ametek, in filing the necessary documentation for purposes of requesting reimbursement of improperly paid tariffs.  (*See id.* at ¶ 4.)  However, FTN is not obligated to file a PSC automatically (i.e., it need not file a PSC just because it has paid a tariff on Ametek's behalf).  (Doc. No. 57-3 at ¶ 10.)  FTN and Ametek do not have a written contract concerning the filing of PSCs by FTN for parts imported by Ametek.  (*Id.* at ¶ 5.)

When Ametek requests that FTN file a PSC for an item for which Ametek believes it was improperly charged a tariff, FTN assigns each item a "dispute number" and notifies Ametek that the dispute number has been assigned and that the matter has been assigned to a FTN import coordinator.  (*Id.* at ¶ 14.)  FTN randomly assigns individual disputes to import coordinators. (*Id.* at ¶ 17.)  When distributing a client's disputes to its import coordinators, FTN often distributes a single client's disputes to multiple different import coordinators, depending on the number of disputes submitted by the client or the import coordinators' workload.  (*Id.*)

Import coordinator and FTN Trade Specialist Erik Wollschlager testified that once an import coordinator is assigned, if the client had provided insufficient information to file a claim, they send the client an Options Letter, laying out next steps for filing a PSC.  (Doc. No. 56-8 at 48:5–25 ("Q: [H]ow was Ametek to know who at FTN would be handling various matters?  How were they notified of that?  A: Generally a letter would have been issued from the Import Coordinator that was handling that entry or series of entries.  Q: What type of letter?  A: It would be a letter that outlined the next steps for handling post entry corrections.  The options letter that we've spoken of is one of those letters.  Q: Are there different varieties of these letters other than the options letter?  A: I mean, you know, there's been instances where the information that was

needed in order to file a claim was already included in the entry packet and a mistake was made at the time of entry.  And so we would just notify the client we've got what we need, we're going to file a claim.  So that wouldn't require us providing options to the client . . ."); *cf.* Doc. No. 58-7 (entries stating "Will send options letter").)  However, according to Ametek's Customer Support Manager Boris Alfonso, Ametek only received Options Letters in the beginning of their relationship with FTN, not later on[2]; in short, there was no standard procedure.  (*See* Doc. No. 56-9 at 79:4–8 (testifying that he "recall[ed] seeing these type of documents at some point," referring to an Options Letter shown to him), 80:13–22 (testifying that he had seen Options Letters before but clarifying that "[t]his happened at the very beginning.  Later on we're not getting these types of letters.  We were requesting them directly to take care of the issues and were not getting the options"), 83:5–18; Doc. No. 57-12 at 74:20–75:6 ("A: The experience with them was all over the place.  There were cases that were solved really fast.  There were cases that take other type of responses, oh, I need this paperwork, can you prove this, can you fill out that.  There were other cases that I never got a response, never . . . So it was – there was not a standard procedure.").)

According to Wollschlager and Michael Manning, another import coordinator and FTN Trade Specialist, they would not submit a PSC on a client's behalf until after receiving their fee.  (*See* Doc. No. 57-17 at 56:23–57:7 ("Q: Now, is it your recollection that when you handled post summary corrections at [FTN] for clients, that in every instance this processing fee of whatever amount it was would be collected after the dispute was either successfully or unsuccessfully

---

[2] Although Alfonso did not specify the timing that constituted the "beginning" of their relationship, he did testify that he did not recall seeing the letters anymore at the end of 2018 and in 2019.  (Doc. No. 56-9 at 83:8–18 ("Q: When you say later on that didn't happen, what do you mean by that?  A: . . . [S]o everything appearing at the end of 2019, end of 2018, 2019, cases were still coming out, and we were already filing post-summary correction, but I don't recall seeing these letters anymore.").)

submitted?  A [Manning]: I wouldn't – I wouldn't submit the claim until I received a fee."); Doc.
No. 57-26 (November 8, 2016 email from Manning to George Ginard, Logistics Supervisor at
Ametek, stating, "In order to correct the entry, applying Civil Air and monitoring the entry, we
will require $75.00 to correct each entry.  After talking with my boss . . . she has reduced the fee
to $60.00 per entry.  *Once the check is received Greg and I will file your disputes with US
Customs . . . .*" (emphasis added)); *cf.* Doc. No. 56-8 at 165:2–8 ("Q: Could you have filed a post
summary correction without Ametek sending you a check for the processing of each of the post
summary corrections?  A [Wollschlager]: No.").)  In contrast, according to Alfonso, a check was
not necessarily required for FTN to resolve one of Ametek's disputed matters.  (*See* Doc. No. 57-
12 at 134:17–135:11 ("Q: Do you know after Ametek sent the check for $1,080.00 to the
attention of Mr. Manning, do you know whether Ametek ever sent any other checks to FTN for
the processing of other post-summary corrections?  A: I don't recall of any other checks being
sent. . . .  As a matter of fact, many of these disputes were solved.  I don't know if Michael
Manning's disputes were solved after the check was paid or not.  I don't recall if they ended up
being closed and liquidated. . . .  There were others being liquidated, but there were no checks
involved.").)

After the import coordinator filed the PSC with Customs, they would move that file from
the distribution queue to the post summary monitoring queue.  (Doc. No. 57-3 at ¶ 14.).
Ultimately, it was up to Customs to determine whether a given exemption applied, not FTN.
(*See id.* at ¶ 16.)

### B.  *The PSCs at Issue*

#### 1.  <u>Ametek Disputes Tariffs Imposed on 14 Items</u>

Between 2015 and 2017, Lufthansa Airlines shipped to Ametek, via Federal Express,

various civil airline parts needing repair.  (Doc. No. 57-3 at ¶ 8.)  Customs imposed tariffs on these parts, FTN paid them on Ametek's behalf, and FTN sent invoices to Ametek for repayment.[3]  (*Id.* at ¶ 9.)

In August and October 2016, Alfonso emailed FTN several batches of dispute forms for customs clearance charges.  (*See* Doc. Nos. 57-15, 57-16, 57-17, 57-18.)  At base, Ametek claims that FTN failed to seek reimbursement from Customs for tariffs imposed on 14 parts from shipments from Lufthansa Airlines, resulting in damages totaling $124,795.05.  (*See* Doc. No. 57-3 at ¶ 19.)  The 14 items were encompassed in the multiple emails of disputed charges Alfonso sent.[4]  (*See* Doc. No. 58-1 at ¶ 20.)

The dispute numbers for these 14 parts are as follows:

---

[3] Previously, Lufthansa had been paying the import duties.  However, after Ametek and Lufthansa entered into a fixed price contract, Ametek became responsible for paying the duties.  (*Id.* at ¶ 9 n.2.)

[4] In early 2016, Lufthansa notified Ametek that it would no longer "issue a shipper's declarations [sic] as required by the US returned goods regulation of Title 19 C.F.R. Chapter I § 10.1 or any other kind of declarations regarding equal or similar content," which meant that Lufthansa parts would not automatically qualify for a certain exemption from import fees when being processed through Customs. (Doc. No. 58-1 at ¶ 16; *see also* Doc. No. 57-13; Doc. No. 57-11 at 42:19–43:11 ("I think it was in 2016, because that's when Lufthansa made this statement that they could no longer provide the shipper certificate . . . regarding the origin of the goods.  So with that, that meant we could no longer use American Goods Returned.  Now, American Goods Returned, because it was a duty exemption and also a fee exemption, none of that was paid at the time of entry, because you would bring it in – it's a special category of products.  It's called 9801.  You bring it in under that, and no duties or fees apply.").)  In September 2016, an import coordinator named Mary Donahue (who was *not* assigned any of the 14 disputes at issue in this case) sent Ametek a draft letter related to this issue.  (*See* Doc. No. 57-20.)  She wrote, "I have been assigned your dispute, I see by an email the shipper refuses to supply a Foreign Shipper Declaration.  I also see this is a US good civil aircraft part unserviceable, coming in for repair and to be return [sic] to shipper.  If this is the case you may complete a Letter of Conformity.  The MPF would still remain but the duty is refundable if US Custom [sic] agrees with the claim." (*Id.*)  Donahue instructed Ametek that they would need to have the Letter of Conformity put on file with FTN.  (*Id.*)  Alfonso and Ginard sent Donahue the Letter of Conformity in October 2016, which was added to Ametek's clearance profile.  (Doc. No. 57-21.)  In an email dated November 8, 2016, import coordinator Michael Manning (who also was not assigned any of the 14 disputes at issue here) informed Ginard that "going forward the letter of conformity you put in place on 10/19/2016 will be used to process your shipments.  If the shipments coming into the country after 10/19/16 are not processed correctly using the letter of conformity then you will not be charged the option fee of $75.00 USD to correct and monitor the correction with US Customs."  (Doc. No. 56-4 at 18.)

6

| Dispute Number |
| --- |
| 516856 |
| 529112 |
| 529113 |
| 529125 |
| 529138 |
| 529140 |
| 529151 |
| 529154 |
| 529156 |
| 529159 |
| 529169 |
| 529173 |
| 529174 |
| 529260 |

(Doc. No. 57-3 at ¶ 20.)  Thirteen of the 14 items at issue in this litigation were assigned to

Wollschlager.[5]  (*Id.* at ¶ 20.)

### 2.  The November 2016 Options Letter

On November 16, 2016, Wollschlager sent Ginard an email attaching a letter concerning

12 of these disputes.[6]  (*See* Doc. No. 56-10.)  In the Options Letter, Wollschlager explained that

FTN's review "indicat[ed] that the duties were correctly assessed based on all documentation

presented at the time of entry.  Inadequate information or documentation at the time of entry and

failure to respond timely or a late response to the Duty Verification resulted in a possible

overpayment of duties to Customs and Border Protection."  (*Id.* at 5.)  Wollschalger wrote that

---

[5] Of the 14 items at issue in this case, only one, Dispute 529260, was assigned to a separate Trade Specialist, Gregory Moore.  (Doc. No. 57-3 at ¶ 21 n.4.)  Moore informed Ginard, "It is too late to file an amended entry and claim with US Customs to request a refund as we only have 180 days from the date of liquidation to file a claim.  This shipment liquidated on 01/13/2016 therefore we had until 11/02/2016 to file a claim on this shipment.  [FTN] did not receive this dispute until 11/03/2016.  This did not allow sufficient time for the dispute to be processed."  (Doc. No. 56-14.)

[6] On August 30, 2016, Wollschlager sent Ginard a separate Options Letter for the thirteenth dispute that had been assigned to him (516856).  (*See* Doc. No. 56-15.)  The parties do not address whether Ginard received this letter.

Ginard should refer to the attached Claim Information Request to see the documentation required for claim filing and stated that the last day to file a claim was November 15, 2017.  (*Id.*) Wollschlager then outlined three different options from which Ametek could choose how to proceed:

> To assist in recovering any overpayment of duty, we would like to offer the following options:
>
> 1.  A claim can be filed per [Customs'] procedures by your firm or your designee and forwarded directly to [Customs] at the address indicated below.  A protest form (CBP19) can be obtained [on] the Customs' website at: http://www.cbp.xp/cgov/toolbox/forms/ should you choose to file a protest on your own behalf. . . .
>
> 2.  You may designate a Customs Broker or Attorney o[f] your choice, or authorized employee acting on your behalf to file a claim.  If this option is selected, please instruct the designee to forward the completed claim and supporting documents to the address referenced [above] for submission to [Customs].  Any fees charged by these parties for this service will be the sole responsibility of your firm.
>
> 3.  If your firm desires, [FTN] the designated Customhouse Broker for Federal Express can prepare the claim on your behalf.  FTN, upon receipt of the supporting documents will complete, file and monitor the claim with [Customs] on your behalf.  This service is subject to a moderate fee of $75.00 (US Funds) per claim to cover the costs of this service.  This fee is payable in advance of the filing.

(*Id.* at 5–6.)  Wollschlager explained that if Ametek selected option 3 and "wish[ed] to have [FTN] file a claim," Ginard should "refer to the Claim Information Request attached."  (*Id.* at 6.) Wollschlager concluded, "At this time, Federal Express is requesting full payment of the invoiced amount that was, in good faith, paid to [Customs] on your behalf.  Should [Customs] approve the claim, a refund will be forthcoming."  (*Id.*)

Wollschlager testified that he never received a response from Ametek.  (*See* Doc. No. 56-8 at 167:12–15; *cf.* Doc. No. 57-10 at 105:11–15, 107:2–9 (testifying that he did not recall whether he received a response from Ginard).)  At no point did Ametek provide FTN with the

processing fee requested in the letter.  (*See* Doc. No. 57-3 at ¶ 37.)  Wollschlager also testified

that absent a response from Ametek and receipt of a fee, FTN would not have been able to file a

PSC with Customs.  (Doc. No. 56-8 at 115:19–25, 165:2–8.)  According to Wollschlager, as a

general matter, if he did not hear back from a client after contacting them (i.e., through an

Options Letter), "that was the end of our handling of the file."  (Doc. No. 57-10 at 104:20–

105:1.)

      Ginard testified that he did not receive the letter, either via email or by postal mail.  (Doc.

No. 57-14 at 51:8–52:6, 54:21–55:14.)  According to Ginard, because he did not receive the

Options Letter, he could not respond to it.  (Doc. No. 57-3 at ¶ 25.)

      Ginard testified that the mailing address on the letter was incorrect as Ametek had not

been at that location for a while and if Wollschlager had mailed the letter there, he would not

have received it.  (Doc. No. 57-14 at 52:13–22, 53:4–7.)  However, Ginard agreed that his email

address, which was listed in the "To" line of the email and in the attached letter, was correct.

(*See* Doc. No. 56-10 at 3; Doc. No. 57-14 at 11:8–18, 55:18–21.)  And Wollschlager received

confirmation from his email server that the email to Ginard was delivered.  (*See* Doc. No. 57-24

("Delivery to these recipients or groups is complete, but no delivery notification was sent by the

destination server:  george.ginard@ametek.com[.]").)

### 3.  <u>Post-Letter Timeline</u>

      Wollschlager never followed up with Ametek after sending the November 2016 Options

Letter.  (*See, e.g.*, Doc. No. 58-4 at 37:24–38:2 ("At the point that we're referring to there was no

follow-up.  There was a single letter issued to the client and that was – if there was no response

then, that was the end.").)

      Although Ginard never responded to Wollschlager's email, there is also evidence that

Wollschlager failed to respond to Ametek's general inquiries about the 14 disputes.  (*See, e.g.*, Doc. No. 57-11 at 253:21–24 ("We only really had trouble with these 14, and it was really due to noncommunication by Wollschlager.  He just wouldn't respond.").)  Alfonso testified that he tried several times to contact Wollschlager and never received a response.  (*See* Doc. No. 57-12 at 91:13–94:3.)  For example, on March 13, 2017 (which was prior to the claim filing deadline referenced in the Options Letter Wollschlager had sent), Alfonso requested a status update from FTN's Duty and Tax Team on certain disputes, and the department emailed Wollschlager, copying Alfonso, about the disputes assigned to him.  (Doc. No. 57-5.)  Wollschlager did not respond.[7]  Further, on February 2, 2018, Alfonso emailed FTN, requesting a status update on the disputes and stating that Ametek's records showed that they were pending approval/denial from Customs.  (Doc. No. 57-28.)  The Tax and Disputes Team responded that Alfonso needed to contact Wollschlager for the information related to the disputes assigned to him.  (*Id.*)  Alfonso then emailed Wollschlager and asked for an update.  (*Id.*)  Alfonso did not receive a response.

Margaret Gatti, International Trade and Sanctions Counsel for Ametek, also emailed FTN in spring 2019 about these disputes.  (*See* Doc. No. 56-4 at 23; Doc. No. 57-26.)  On April 30, 2019, Gatti emailed the Duty and Tax Team about disputes for which Ametek never received any status update from FTN.  (Doc. No. 57-26 at 2.)  On May 6, the Team responded, "All entries were processed by Erik Wollschlager and per comments were closed due to not enough information from customer.  Please contact Erik . . . [for] more information."  (*Id.*)  Gatti then emailed Wollschlager.  (*See* Doc. No. 56-4 at 23.)  On May 9, 2019, Wollschlager responded,

---

[7] Wollschlager did not recall seeing the email and testified that he did not believe the email address listed for him was a valid email address.  (*See* Doc. No. 57-10 at 107:10–108:9.)  However, the email address listed is the same as the email address he used to send the May 9, 2019 email mentioned below.  (*Compare* Doc. No. 57-5 at 3 (March 17, 2017 email sent to erik.wollschlager@fedex.com ), *with* Doc. No. 56-4 at 25 (May 9, 2019 email sent from erik.wollschlager@fedex.com).)

"George Ginard of Ametek was notified of the cost of filing claims and the documents required. To my knowledge, there was no response to this communication." (*Id.*)  He also advised that he "no longer hold[s] this position." (*Id.*)  That same day, Diana DiSanto, a FTN Administrator, confirmed to Gatti that no claims were filed on any of the disputes at issue. (*Id.* at 25.)

### C.  Procedural History

On June 26, 2020, Ametek initiated this action by filing a Complaint against FTN. (Doc. No. 1.)  On July 29, 2022, the parties proceeded to arbitration and an arbitration award was entered. (*See* Doc. Nos. 48, 51.)  Shortly thereafter, Ametek demanded a trial de novo. (Doc. No. 53.)  The Court issued a Scheduling Order and, in accordance with that Order, FTN filed the instant motion for summary judgment on November 7, 2022. (Doc. Nos. 55, 56.)  Ametek opposes the motion. (Doc. Nos. 57, 59.)

## II.    Legal Standards

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Judgment will be entered against a party who fails to sufficiently establish any element essential to that party's case and who bears the ultimate burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In examining the motion, we must draw all reasonable inferences in the nonmovant's favor. *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159–60 (3d Cir. 2003).

Disagreements over what inferences may be drawn from the facts, even undisputed ones,

preclude summary judgment. *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996) (citation omitted). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from those facts" are matters left to the jury. *Anderson*, 477 U.S. at 255.

The initial burden of demonstrating that there are no genuine issues of material fact falls on the moving party. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, the nonmoving party must counter with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). The non-moving party must show more than the "mere existence of a scintilla of evidence" in support of its position. *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

## III.   Discussion

FTN moves for summary judgment on Ametek's breach of contract and promissory estoppel claims, arguing that the parties never formed an implied contract and that Ametek has no proof that FTN made an express promise to support a promissory estoppel claim. (*See* Doc. No. 56-1.) We address each contention in turn.

### A.  *Breach of Implied Contract*

Under Pennsylvania law, to establish a breach of contract claim, a plaintiff must prove "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (cleaned up). As to the first element, although it is undisputed that the parties did not have an express contract, Ametek and FTN have diverging views on whether an implied contract was

formed.

"A contract implied in fact is an actual contract which arises where the parties agree upon the obligations to be incurred, but their intention, instead of being expressed in words, is inferred from acts in light of the surrounding circumstances."[8] *Liss & Marion, P.C. v. Recordex Acquisition Corp.*, 983 A.2d 652, 659 (Pa. 2009) (internal quotation marks and citations omitted); *see also Ingrassia Constr. Co.*, 486 A.2d at 483 ("A contract implied in fact can be found by looking to the surrounding facts of the parties' dealings."). "Implied contracts . . . arise under circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intention to contract." *Ingrassia Constr. Co.*, 486 A.2d at 483 (cleaned up). "As with all contracts, . . . an implied-in-fact contract exists only if the parties . . . agree upon the material and necessary details of the bargain, and the agreement is supported by adequate consideration." *Universal Atl. Sys., Inc. v. Honeywell Int'l*, 388 F. Supp. 3d 417, 428 (E.D. Pa. 2019) (internal quotation marks and citations omitted).

Here, the parties vehemently disagree over what the parties' course of dealing actually was and, therefore, whether it gave rise to an implied contract. FTN maintains that after Ametek disputed the tariffs that Customs imposed on a given item in an email to FTN, FTN would assign a dispute number and import coordinator; the assigned FTN import coordinator would send an Options Letter, directing Ametek to choose one of three options on how to proceed; and if Ametek chose to have FTN file a claim with Customs on its behalf, FTN required payment before doing so. According to FTN, this course of conduct underscores that an implied contract is only formed once FTN receives its payment. Thus, FTN posits that an implied contract was

---

[8] "A contract implied in fact has the same legal effect as any other contract:  It differs from an express contract only in the manner of its formation." *Ingrassia Constr. Co., Inc. v. Walsh*, 486 A.2d 478, 483 n.7 (Pa. Super. Ct. 1984).

never formed because it is undisputed that Ametek did not respond to the Options Letter that Wollschlager sent to Ginard and it never rendered payment.

In contrast, Ametek maintains that the parties' course of dealing shows that an implied contract is formed once FTN assigns the dispute number. According to Ametek, FTN had no standard procedure for handling PSCs and payment is not a prerequisite to proceed. In so arguing, Ametek points to the fact that FTN provided no other Options Letters during discovery (i.e., those that were sent in matters unrelated to the 14 items at issue in this case),[9] Alfonso's testimony that FTN did not have a standard procedure for handling disputes and that Options Letters were only used in the beginning, and Alfonso's testimony that payment was not always required before a dispute was resolved. Ametek also maintains that Ginard did not receive the Options Letter[10] and Wollschlager skirted his duties by stonewalling Ametek and failing to respond to Alfonso's communications. Finally, Ametek highlights that it did not have any issues in the other disputes it filed, which were assigned to import coordinators other than Wollschlager and remedied.

At this juncture, the Court cannot make credibility determinations and must construe all facts (and all inferences that can be drawn from those facts) in the light most favorable to Ametek. Because Ametek has presented evidence from which a reasonable juror could find that FTN did not always provide Options Letters or require payment before filing a claim with

---

[9] Specifically, Ametek alleges that FTN did not produce an Options Letter corresponding to each of the 73 other PSCs it filed for Ametek. (Doc. No. 58-1 at ¶ 61.)

[10] The Court finds George Ginard's testimony that he did not receive Wollschlager's email with the November 2016 Options Letter (despite confirming that the email address Wollschlager sent the letter to was correct, and in the face of record evidence showing that the email was delivered by Microsoft Outlook) dubious. Nonetheless, the Court is not permitted to make credibility determinations at this time. Likewise, as noted above, Wollschlager's testimony that he did not receive the March 13, 2017 email is questionable given that he later sent an email from the same address listed.

Customs on Ametek's behalf, such that the parties' course of dealing was inconsistent at best, and because we must take as true Ginard's testimony that he did not receive the November 2016 Options Letter, the Court cannot conclude that summary judgment is appropriate at this time.[11]

### B. Promissory Estoppel

The doctrine of promissory estoppel "allows the court to enforce a party's promise that is unsupported by consideration where (1) the promisor makes a promise that he reasonably expects to induce action or forbearance by the promise, (2) the promise does induce action or forbearance by the promise, (3) and injustice can only be avoided by the promise." *Greenwald Caterers Inc. v. Lancaster Host, LLC*, -- F. Supp. 3d --, 2022 WL 1204154, at *22 (E.D. Pa. Apr. 22, 2022) (cleaned up); *see also Edwards v. Wyatt*, 335 F.3d 261, 277 (3d Cir. 2003); *C & K Prods., Inc. v. Equibank*, 839 F.2d 188, 192 (3d Cir. 1988) ("Generally, promissory estoppel is designed to prevent the injustice that results when a promisee is reasonably induced by, and

---

[11] FTN separately argued that an implied contract was never formed because FTN did not perform any services for Ametek as to the 14 claims at issue. (*See* Doc. No. 56-1 at 17 ("It is clear that FTN did not perform the service. Ametek's request and promise to pay for it, therefore, does not establish an enforceable contract.").) "With regard to an implied contract, when a request for a performance is made under circumstances that a reasonable person would infer an intent by the requestor to pay for it, the request amounts to an offer and a contract is created when the performance is rendered." *Great N. Ins. Co. v. ADT Security Servs., Inc.*, 517 F. Supp. 2d 723, 737 (W.D. Pa. 2007) (cleaned up) ("CFU's request for service on its security alarm system, from which ADT could reasonably infer that CFU intended to pay for said service, became an enforceable unilateral contract once the requested service was provided by ADT."); *see also Golkow v. Esquire Deposition Servs., LLC*, 2009 WL 3030218, at *3 (E.D. Pa. Sept. 23, 2009) ("A unilateral contract is proven if the plaintiff can show that one party made a promissory offer, which calls for the other party to accept by rendering performance."). Here, FTN contends because it did not "perform the service"—i.e., it did not file any claims with Customs on Ametek's behalf for the 14 disputed claims—an enforceable unilateral contract was never created. Ultimately, FTN fails to draw all facts and inferences in the light most favorable to Ametek and construes "performance" in a manner different from Ametek. At base, there is a dispute as to what constitutes "performance" here: FTN appears to take the position that "performance" means filing claims with Customs on Ametek's behalf (*see* Doc. No. 56-1 at 16–17), while Ametek appears to believe that "performance" occurs once FTN assigns dispute numbers to items for which Ametek believes it is entitled to reimbursement from Customs. Because a reasonable juror could find that FTN accepted Ametek's offer of payment for services when FTN assigned dispute numbers to the 14 disputed claims, the Court denies summary judgment on this ground as well.

relies upon, some promise by a promisor that is broken."). "Generally, this doctrine is invoked in situations where the formal requirements of contract formation have not been satisfied and where justice would be served by enforcing a promise." *Greenwald Caterers Inc.*, 2022 WL 1204154, at *22.

FTN argues that the promissory estoppel claim must be dismissed because there was no express promise and the Third Circuit has held that an implied promise is insufficient to support a promissory estoppel claim. (*See* Doc. No. 56-1 at 23–25.) In *C & K Petroleum Products, Inc. v. Equibank*, the Third Circuit affirmed the district court's dismissal of a promissory estoppel claim, reasoning that "there [was] no express promise by Equibank [the defendant] that could justifiably be relied upon." 839 F.3d at 192. The Third Circuit explained: "Promissory estoppel would be rendered meaningless if this Court were to allow C & K to maintain an action for detrimental reliance based on the alleged existence of such a broad and vague implied promise." *Id.*; *see also MRO Corp. v. Humana Inc.*, 383 F. Supp. 3d 417, 423 (E.D. Pa. 2019) ("There must be an express promise between the promisor and the promisee; a 'broad or vague implied promise' will be deemed insufficient. To qualify as an express promise, courts have held that the promise must indicate with 'reasonable certainty' the intent of the parties." (cleaned up)). Ametek counters that the Court should disregard the Third Circuit's decision in *C & K Petroleum Products* because this Court is sitting in diversity and the Pennsylvania Supreme Court has not spoken on whether an express promise is required or whether an implied promise will suffice. (Doc. No. 57-2 at 26 n.8.)

Neither party cites the Third Circuit's more recent decision, *Dansko Holdings, Inc. v. Benefit Trust Co.*, 991 F.3d 494 (3d Cir. 2021), in which the Third Circuit explicitly rejected the defendant's argument that under Pennsylvania law, promissory estoppel applies only to express

promises, *see id.* at 499.  The Third Circuit reasoned, "Pennsylvania has adopted the *Restatement* view of promissory estoppel.  And one of the Restatement's examples of estoppel involves an implied promise.  Plus, in dicta, many lower Pennsylvania courts have said that 'misleading words, conduct, or silence' can amount to a 'promise' that will support promissory estoppel." *Id.* at 499–500 (emphasis in original).  In *Dansko*, the Third Circuit also distinguished from its prior *C & K* decision: "[The defendant] reads *C & K* as requiring an express promise.  But the case is not so broad.  There, we upheld the dismissal because it rested on 'such a broad and vague implied promise.'  In other words, *that* promise was too indefinite.  We did not hold that an implied promise can never be narrow and specific enough.  We think that one could be." *Id.* at 500.

Because an implied promise may support a promissory estoppel claim in some cases, and FTN's summary judgment motion as to this claim hinges solely on the fact that there was no express promise, the Court denies FTN's motion for summary judgment.

**IV.     Conclusion**

For the foregoing reasons, the Court denies FTN's motion for summary judgment.

An appropriate Order follows.